OMATH HOLDING COMPANY, INC., Appellant, v CITY OF NEW YORK, Respondent and Third-Party Plaintiff-Respondent, et al., Defendant. OMATH HOLDING COMPANY, INC., et al., Third-Party Defendants-Appellants.

First Department, August 24, 1989

APPEARANCES OF COUNSEL

*Edward J. Schwarz* for Omath Holding Company, plaintiff-appellant and third-party defendant-appellant.

*Fred Kolikoff* of counsel *(Larry A. Sonnenshein* with him on the brief; *Peter L. Zimroth, Corporation Counsel,* attorney), for City of New York, defendant-respondent.

*Jay R. Fialkoff* of counsel *(Elizabeth M. Smith* with him on the brief; *Stroock & Stroock & Lavan,* attorneys), for Orbach's, Inc., third-party defendant-appellant.

OPINION OF THE COURT

Smith, J.

The issue here is whether the defendant City of New York in June 1986 properly terminated a 1968 lease agreement with the plaintiff Omath Holding Company, Inc. (Omath) where the lease term never commenced and the development

contemplated by the lease had not begun. We conclude, as did the motion court, that the lease agreement was properly terminated.

In 1966, the city invited bids for the development of a marina, boatel and other facilities on a parcel of city-owned waterfront property which consisted of 66 acres of upland and 11 acres of underwater land in the Mill Basin section of Brooklyn. Omath's bid was selected and it commenced lease negotiations with the city. On September 7, 1967, based upon the "first draft" of a proposed lease, Omath entered into a sublease for the premises with third-party defendant Ohr-bach's Inc. (Ohrbach's). This sublease contemplated that the premises would be rezoned on the date that Omath's lease with the city was executed.

On August 22, 1968, the New York City Board of Estimate authorized a lease between the city and Omath, which lease was executed on October 16, 1968. The lease specifically required that Omath construct upon and maintain the demised premises as "a marina, boatel, restaurant and bar, recreation and cabana area, snack bars, motion picture theatre, shopping center * * * and facilities incidental to the operation thereof and for no other purpose except with the prior written approval of the Commissioner in each instance."

The lease reflects the awareness of both parties that the property would first have to be rezoned in order to permit the contemplated development and that permission for this rezoning might never be obtained. In fact, by letter dated October 9, 1968 the City Planning Commission (CPC) advised attorneys for Omath that CPC was not favorably inclined to the proposed rezoning. Omath was not required to pay rent under the lease or to commence construction until rezoning occurred. In this regard, the lease explicitly states:

"Lessor acknowledges that the premises are not presently zoned in such manner as will permit the construction contemplated herein and lessee agrees to apply promptly to the proper agency for the rezoning. * * * [T]his lease shall not be deemed to commence until such rezoning is finally accomplished * * * lessee shall not be required to commence * * * construction until the date of such rezoning. * * * In the event that such rezoning is not accomplished, lessor * * * shall not be liable for any damages by reason thereof. * * *

"It is the intent of this lease that the work (construction) proceed with due diligence, it being understood that time is of the essence".

The lease provided for an initial term of 20 years and for three renewal terms of 10 years. The initial lease period was to commence on the earlier of the date on which Omath substantially completed construction work on the project; the date on which Omath commenced business at the premises; or 42 months following rezoning of the property. Omath could not commence business until completion of construction and construction could not commence until the rezoning.

On October 8, 1969, Omath executed a second sublease for a portion of the property to third-party defendant Federated Department Stores (Federated).* This sublease required that Federated construct a building and provided that its lease term would commence within 120 days after the building was completed. However, Federated was not required to have prepared plans and specifications until after the area was rezoned and if the property was not rezoned within two years either party could terminate the sublease. The sublease stated:

*"Section 30.1* In the event that * * * (b) the Shopping Center is not zoned within two years of the date of this Lease * * * Tenant then may terminate this Lease. * * *

*"Section 30.2* In the event that the Shopping Center is not zoned within two (2) years of the date of this lease * * * Landlord may then terminate this Lease".

On September 23, 1970, CPC denied Omath's application to have the Mill Basin property rezoned so as to allow the contemplated development. Omath did not challenge this decision. Further hope for the development was dashed when in 1977 the New York State Department of Environmental Conservation designated approximately two thirds of the Mill Basin property as tidal wetlands, in effect precluding the contemplated development. Again, Omath did not contest this designation. Omath has not commenced any construction or paid any rent under the lease. As the zoning status and wetlands designation of the property makes impossible development in accordance with the lease, the city and Omath, thereafter, intermittently discussed alternative development plans, without result.

By letter of June 10, 1986, Omath was advised by the New York City Public Development Corporation (PDC) of the city's position that because 18 years had passed since execution of

---

* Federated has never appeared in this action.

the lease and because the agreed-to development was foreclosed, the lease was null and void. PDC requested that Omath surrender the lease so that title to the property could be quieted and stated that upon surrender, the process for releasing the security guaranteeing Omath's construction obligation under the lease would begin. PDC further explained that once title was quieted, it would solicit new proposals for development of a portion of the premises and encouraged Omath to submit its own proposals.

In response Omath, on July 8, 1986, commenced the instant action to have the lease declared valid and binding, and to enjoin the city from leasing or otherwise conveying the property. In a counterclaim naming both Omath and its sublessees, the city sought a declaration that its title to the property is absolute.

In April 1987, the city moved for summary judgment, arguing, *inter alia,* that the Rule Against Perpetuities (the Rule), codified under EPTL 9-1.1, caused the lease to be void *ab initio.* The city contended that since the lease made commencement of Omath's leasehold contingent upon rezoning, which contingent interest need not vest or become extinguished within the period of a life in being plus 21 years, Omath's interest was void. It also argued that the lease was void under common-law contract principles because performance under the lease had been rendered impossible.

Omath in its reply, citing *Wong v DiGrazia* (60 Cal 2d 525, 386 P2d 817 [1963]) and similar holdings in other jurisdictions, argued that in order to avoid the harsh results of the Rule, the lease should be construed as requiring that it is effective upon the rezoning of the land, that rezoning must take place within a "reasonable period" and that such reasonable period was within 21 years. Moreover, Omath claimed that the intent of the parties as to what is a "reasonable time" could be ascertained only through full discovery and trial. It asserted that the doctrine of impossibility did not apply since at the time of execution, the parties contemplated the possibility that rezoning would not occur.

The IAS court determined that while EPTL 9-1.1 applied to lease agreements, the Rule did not void the lease *ab initio* because the lease should be construed as providing that rezoning take place within a "reasonable" period of time, which would be less than 21 years (138 Misc 2d 271). Concluding that as a matter of law a "reasonable" period of time had passed,

the IAS court granted summary judgment dismissal of the complaint declaring that (1) the lease with Omath had been validly terminated, (2) Omath and its sublessees were barred from claiming any interest in the property, and (3) the city was entitled to sole possession.

This appeal by Omath and Ohrbach's followed.

On this appeal Omath and Ohrbach's urge that the Rule does not apply to this case, and even if it does, the Rule cannot be utilized by inferring a "reasonable time" to vest. Omath further contends that even if a "reasonable time" with respect to the clause calling for it to obtain rezoning could be inferred, such clause is a condition subsequent rather than a condition precedent to the vesting of Omath's interest upon execution of the lease. Finally, Omath urges that if a "reasonable time" is inferred and its interest in the property has not vested, summary judgment is inappropriate as questions of fact remain with respect to what is a "reasonable time".

In New York the disposition of property by a landowner is limited by three rules. "The first two, known as the Rule Against Perpetuities, are found in subdivisions (a) and (b) of EPTL 9-1.1. The rule declares that no estate in property shall be valid (1) if the instrument conveying it suspends the power of alienation for a period longer than lives in being at the creation of the estate plus 21 years and (2) unless it must vest, if at all, before expiration of the same period. * * * The third rule regulating dispositions is established by common law and invalidates conveyances which impose unreasonable restraints on alienation." *(Metropolitan Transp. Auth. v Bruken Realty Corp.,* 67 NY2d 156, 161 [1986].)

While the plaintiff argues here that the Rule Against Perpetuities is inapplicable to leases and the defendant argues with equal vigor that it is, we note, as did the motion court, that no New York case has applied the Rule to leases and it is unnecessary to do so here. Rather, the instrument provides for the commencement of the lease term upon rezoning and for Omath to develop the property in a manner which is prohibited by the city's zoning regulations, and, since the lease has no provision for cancellation in the event the property is not rezoned, it imposes an unreasonable restraint on alienation of property under the common law. To conclude otherwise would be to find that Omath's contingent leasehold interest will exist indefinitely.

The lease, like any other contract, should be construed in

such a manner as to effectuate the intent of the parties and as to produce a reasonable result. In *Tantleff v Truscelli* (69 NY2d 769 [1987], *affg* 110 AD2d 240 [2d Dept 1985]) a 1957 agreement provided tenants with two options, (1) the option of first refusal in the event of a bona fide offer to purchase the property at the offered price and (2) an option to purchase the property at $100,000. In 1981, when notified by the owner of an offer to purchase the property for $300,000, the tenants sought to enforce the exercise of the option to purchase at $100,000. The Court of Appeals affirmed the conclusion reached by the Appellate Division that a "reasonable" interpretation of these provisions was that the tenant could exercise the "fixed-price option" only before the landlord had received a bona fide offer which he wished to accept and had given the tenant appropriate notice thereof *(supra,* 110 AD2d, at 244-245; *see also, Hsieh v Pudge Corp.,* 122 AD2d 198, 199 [2d Dept 1986] [lease construed as creating an interest in the building to be used as a restaurant and to the parking area rather than as conveying an interest in the entire shopping center]).

Here, a reasonable interpretation of the agreement is that the parties did not intend that if the land were not rezoned within a "reasonable period" of time, the lease would remain in force indefinitely. The agreement provided that once rezoning was obtained, construction of the project was to proceed with due diligence. Thus, the IAS court properly interpreted the contract as providing for rezoning within a reasonable time and determined as a matter of law that a reasonable period of time had expired since over 18 years had elapsed since execution of the lease. In this respect the provision in Omath's sublease to Federated for termination of the sublease if the area was not rezoned within two years is noteworthy.

With respect to Omath's contention that the city acted in bad faith, we find no indication in the record that the city knew for a fact that the area would never be rezoned. Rather, the lease reflects that both parties were aware that the area would have to be rezoned before the anticipated development. The city cooperated in Omath's efforts at obtaining rezoning. Indeed, the city's failure to immediately seek to terminate the lease upon denial of rezoning or even after the wetlands designation, and its discussions with Omath of alternative development plans, evidence good faith on its part.

Finally, we reject Omath's contention that the question of what constitutes a reasonable time is one of fact for a jury.

When, as in this case, the parties rely upon a written agreement, the facts are not in dispute and no specific reference is made to any parol evidence necessary to shed light upon the meaning of the agreement, the interpretation of the writing presents an issue of law which the court properly may determine on a motion for summary judgment. *(Tantleff v Truscelli, supra,* 110 AD2d, at 244.)

Order and judgment (one paper) of the Supreme Court, New York County (Edward H. Lehner, J.), entered March 30, 1988, which granted summary judgment to the defendant third-party plaintiff, the City of New York, terminated a lease entered into between plaintiff third-party defendant Omath Holding Company, Inc. and the city, and awarded exclusive possession of the premises to the city, should be unanimously affirmed, without costs.

MURPHY, P. J., MILONAS, KASSAL and ROSENBERGER, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered on March 30, 1988, unanimously affirmed, without costs and without disbursements.